UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CHARLES DAVIS                    CIVIL ACTION NO. 15-cv-2444

VERSUS                           JUDGE FOOTE

N. BURL CAIN                     MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury convicted Charles Ray Davis ("Petitioner") of three counts of molestation of a juvenile. He was adjudicated a second-felony habitual offender on one of the counts, and he received concurrent sentences of 10, 25, and 58 years. His convictions and sentences were affirmed on appeal. State v. Davis, 108 S.3d 833 (La. App. 2d Cir. 2013), writ denied, 123 So.3d 163 (La.). He also pursued a post-conviction application in state court. Petitioner now seeks federal habeas relief on the basis of insufficient evidence, denial of the right to present a defense, and four claims of ineffective assistance of counsel. For the reasons that follow, it is recommended that his petition be denied.

**Sufficiency of the Evidence**

**A. Relevant Facts**

**1. Introduction**

A Shreveport hospital called the Shreveport Police Department to report the sexual assault of a child. Detective Deondre Belle with the Sex Crimes Unit conducted an investigation, which resulted in Petitioner's arrest for the molestation of 14-year-old MoT,

13-year-old MG, and 11-year-old MyT.  Petitioner is MG's uncle, and he was in a relationship with the mother of MyT and MoT, who are sisters.  Each of the three girls was interviewed at the Gingerbread House, a local advocacy center with employees who are trained to conduct forensic interviews of children.  Sarah Jose testified about how she conducted the interviews, and audio-video recordings of the interviews were introduced into evidence.  As discussed below, the three girls each testified live at the trial, and their video-taped interviews were played for the jury.  DVD recordings and transcripts of the interviews are in the record at Docs. 23 and 25.

### 2. Bobbie Jean Burns

Bobbie Jean Burns testified that she attended the 13th birthday party for her granddaughter, MG.  There was talk at the gathering that a young boy said he had sex with MG.  Ms. Burns asked MG to tell her the truth about what happened.  The girl denied having any relationship with the boy, but she burst out crying and said, "Granny, it was not him."  MG continued, "It's not him.  It was Dolla."  Ms. Burns explained that Dolla is a nickname for Petitioner, who is MG's uncle (half-brother to MG's mother).  Ms. Burns summoned MG's mother and told her that the child had said that it was Dolla and not the boy.  MG also told her grandmother that she had written on the wall in her bedroom to note what happened.

Ms. Burns took MG to the hospital the next morning.  On the way, MG was still crying, and she said it was the truth but no one would believe her.  The prosecutor asked Ms. Burns if MG explained to her what it meant when she said Dolla did it.  Ms. Burns said she had: "That they had sex."  Ms. Burns said the child did not tell her how many

times they had sex, but Burns later testified that MG told her, "Granny, it's the truth.  He did. He was in my room one night.  He did, Granny."  MG also told Ms. Burns that Dolla had sex with one of her friends, MyT.  Tr. 250-64.

### 3.  MG

MG, who was 14 at the time of trial, watched her video interview and testified that her statements in that interview were true.  MG stated in the recorded Gingerbread House interview that she was then 13 and in the seventh grade.  She said that she was there "because of my uncle," and she described the incidents with him.  The first time, he came to her room and "told me to give him five minutes."  She asked, "For what?"  Petitioner then "started feeling on me and stuff," and MG asked him to move.  She said he "started rubbing on my belly and my legs" on top of her clothes.  He then "took off his clothes" and "forced hisself on me."  When asked to explain what that meant, MG said, "He pushed hisself inside of me."  The examiner later showed MG drawings of male and female bodies and asked her to explain what happened when Petitioner forced himself inside of her.  She marked the drawings and said that Petitioner used his "private part" and forced it inside of her "private part."

MG described another incident when Petitioner "walked in and he started feeling on me again."  Petitioner stopped when MG's brother walked in the house.  When asked to explain what happened during the incident, she said, "He eased up under my shirt" and touched her on her belly.

MG described another time when she was with her cousin MyT.  The girls were in a bed playing when Petitioner entered the room "and he started feeling on her."  She said

that Petitioner started rubbing or feeling on both girls' legs. When asked to elaborate where he was feeling on MyT, she said, "All between her legs." MG was not sure if it was on top of or below MyT's clothes because Petitioner's hand was under the cover. MyT scooted down in the bed. "And as she was scooting in the bed, he was getting closer on the bed." MG said that when Petitioner felt on her on that occasion it was on her legs, stomach, and belly "under my clothes."

In the courtroom, MG identified photographs of what she had written on the wall in her bedroom. One writing was dated October 6, 2010 and said, "Dolla drunk, touched me and did something he had no business." The other writings were dated 2010 without more specification. They said, "Dolla is wrong for what he did," "Dolla touch me in the wrong spot," "Dolla did it again," and "Dolla touch My-My (a nickname for MyT)." Tr. 278-303.

### 4. MyT

MyT, who was 13 at the time of trial, testified about the incidents and confirmed her statements made in her recorded interview. She described Dolla/Petitioner as her mother's boyfriend, who sometimes stayed in their home. She said that she sometimes slept over at MG's house.

MyT told the Gingerbread House examiner that she was then 11 and in the sixth grade. She described the several members of her household and said that she knew she was at the Gingerbread House "because of Dolla and what he did to my cousin." The examiner asked her if Dolla ever touched her, and she said, "Yeah, sometimes." The examiner asked MyT to describe what had happened. MyT said that when she stayed with her cousin (MG) Petitioner "will come up over there and, like, touching on us." When

asked where he had touched MyT, she said, "Like, right here (uses her right hand to touch her breast area) and down here (uses her right hand to point between her legs)." She said he had done that two or three times on top of her clothes. When asked if he ever touched her under her clothes, she shook her head no. MyT talked about getting ready for school one day when Petitioner "tried to feel on me."

MyT was also asked to describe what she had seen Petitioner do to MG. She said that she had seen Petitioner touch MG on top of her clothes but not underneath them. She said that Petitioner would "just, like, touch on her," and MG would ask him to move, or she would move around the room.

The examiner showed MyT drawings of bodies and asked her to circle the parts where Petitioner had touched her. The child did so as she said, "Right here and here." The examiner asked MyT what she called those parts of her body, and she answered, "Breasts and private."

MyT testified at trial that Petitioner never touched her when they were at her house. She said Petitioner did not threaten her. He did give her money on the same day he touched her, but she did not think it was for that reason. Tr. 312-23.

### 5. MoT

MoT, who was 15 at the time of trial, testified live and confirmed the truth of the statements in her recorded interview. MoT told the Gingerbread House examiner that she was then 14 and in the seventh grade. She is MyT's sister and lives with several other family members. She said that she was at the interview because Petitioner "be touching me and stuff."

She said that when Petitioner would spend the night, "He be touching me right here and stuff and I be telling him to stop." As she said that, she used her right hand to circle and point to her breasts. She said she had clothes on during such touching, which happened more than one time. She also said that she had seen him touching MyT (on top of her clothes) and touching her cousin. Describing the touching of MyT, she said, "That he be touching her (indicating) like -- that he be touching her (indicating) like right --." As she said that, she used her right hand to twice point to her breasts.

MoT testified that she told two older brothers about Petitioner touching her, but she was not sure when she told them. Petitioner did not threaten her or give her anything when he touched her, and he did not tell her not to tell anyone. She said that she and MyT did talk to each other about Petitioner touching them. Tr. 324-33.

### 6. Dr. Rodriguez

Dr. Jennifer Rodriguez is a pediatrician who is employed at the Cara Center, the regional center where children are evaluated for suspected abuse and neglect. She had worked there for more than 10 years and had received specific training for evaluation of children for sexual and physical abuse. She examined MG on October 12, at least several days since the last reported incident of abuse. She testified that MG had a normal general physical exam. Her hymen was normal, and there was no bleeding.

Dr. Rodriguez explained that the vast majority of children who are evaluated for sexual abuse also have normal exams. Some types of abuse do not cause injury, and in some cases tissue can stretch and move out of the way. Some injuries heal. She described a prior child patient with a very significant tear in her hymen that, a week or two later,

could not be detected even though Dr. Rodriguez knew exactly where to look. She described experience with children that disclosed consensual sexual activity multiple times who nonetheless had normal exams. She also referenced a study in which only 13.2% of girls who had a history of more than 10 episodes of penetration showed any definitive findings of abuse. In other words, a normal exam or lack of injury does not rule out penetration. A normal exam is also consistent with no sexual penetration. Tr. 346-57.

### 7. Detective Belle

Detective Belle testified that he told Petitioner by phone that there was a warrant for his arrest and that Petitioner should come tell the officer his side of the story. Belle said that Petitioner replied that he had quit his job, was out of town, and was not coming in. "No, I'm going to make you do your job." The officer had a task force begin a door-to-door search, but Petitioner turned himself in later that day. Tr. 380-81.

### 8. Petitioner

Petitioner testified that he was 45 years old, and he denied molesting any of the girls. He disputed the testimony of the officer about refusing to turn himself in. He said that he was in the Cedar Grove neighborhood in Shreveport (not out of town) when he talked to the officer, and he did turn himself in. Petitioner admitted to prior convictions for simple burglary, simple battery, distribution of cocaine, and participating in a riot. Petitioner admitted that he had been dating the mother of two of the alleged victims for about two years, and he would often stay overnight at her house. On other nights, he stayed with his sister and her children. He denied that he was ever "put in charge" of MG when he stayed

with his sister, but he admitted that he was sometimes left alone with the girl. Petitioner

denied that he gave the girls money for any reason. Tr. 383-94.

**B. Analysis**

Petitioner was convicted of violating La. R.S. 14:81.2(A), which then provided:

> "Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense."

Petitioner argues there was not sufficient evidence of (1) a "lewd or lascivious act" or that

(2) he used his influence by virtue of a position of control or supervision over the girls.

In evaluating the sufficiency of evidence to support a conviction "the relevant

question is whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson

inquiry "does not focus on whether the trier of fact made the correct guilt or innocence

determination, but rather whether it made a rational decision to convict or acquit." Herrera

v. Collins, 113 S.Ct. 853, 861 (1993).

The state appellate court addressed these arguments on direct appeal. It noted that

state jurisprudence had defined "lewd" as lustful, indecent, lascivious, and signifying the

form of immorality which has relation to sexual impurity or incontinence carried on in a

wanton manner. Lascivious was described as the excitement of lust, lewd, indecent,

obscene, relating to sexual impurity, tending to deprave the morals relative to sexual relations. State v. Davis, 108 S.3d at 841. The court noted that there was evidence that Petitioner had touched the breasts of MyT and MoT, and he engaged in sexual intercourse with MG. This was deemed sufficient for a rational trier of fact to have found a lewd and lascivious act on each count. Id.

With regard to influence by virtue of position of control or supervision, the appellate court noted that MG testified Petitioner was her uncle who lived with her, and she was alone with him in the home during one of the incidents. The other two victims testified that Petitioner was their mother's boyfriend, and he was the father of their youngest half-sibling. He also often lived with them. The court pointed to Louisiana decisions that found molestation accomplished by virtue of control or supervision by non-custodial parents, babysitters, relatives, friends, and neighbors. The evidence in this case was deemed sufficient to prove this element. State v. Davis, 108 So.3d at 841.

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable

application of the deferential <u>Jackson</u> standard.  <u>Parker v. Matthews</u>, 132 S.Ct. 2148, 2152 (2012); <u>Harrell v. Cain</u>, 595 Fed. Appx. 439 (5th Cir. 2015).

Petitioner admits that there was testimony that he had intercourse with MG and that he touched MyT on top of her clothes on two or three occasions, as well as that he touched her on her breasts and "lower."  He also admits there was testimony that he touched MoT's breasts on top of her clothing.  The record reflects such testimony.  Given the setting, the age disparity, and other circumstances, a reasonable juror could determine that those actions were lewd or lascivious with the intention of arousing or gratifying Petitioner's sexual desires.  There was no innocent or other explanation for the physical touching that was apparently unwanted and often protested by the girls.  The circumstances also support the verdict on the factor of "influence by virtue of position of control or supervision."  Petitioner was a much older adult who often lived in or stayed overnight in the homes.

If the prosecution witnesses were accepted as credible, then it was rational to conclude that there was no reasonable doubt as to Petitioner's guilt.  Petitioner argues that there were inconsistencies in the testimony by the girls and other reasons that they should not be believed. But credibility determinations are squarely within the province of the trier of fact.  "[U]nder <u>Jackson</u>, the assessment of the credibility of the witnesses is generally beyond the scope of review."  <u>Schlup v. Delo</u>, 115 S.Ct. 851, 868 (1995).  And "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  <u>Cavazos v. Smith</u>, 132 S.Ct. 2, 4 (2011).  The state court's application of the <u>Jackson</u> standard to the jury's verdict was not an objectively

unreasonable application of that standard. The evidence was adequate to preclude a federal habeas court from overturning the verdict.[1]

## C. Right to Present a Defense

### 1. Relevant Facts

Defense counsel wished to present evidence that MG had accused another relative of molesting her, but the man denied the event. Counsel also wanted to be able to cross-examine MG about this allegedly false accusation. The State filed a motion in limine to challenge that approach.

Louisiana Code of Evidence Article 412 ordinarily prevents the introduction of evidence of the victim's past sexual behavior. But the Supreme Court of Louisiana has held that Art. 412 is inapplicable where the accused seeks to question witnesses regarding the victim's *prior false allegations* concerning sexual behavior for impeachment purposes. State v. Smith, 743 So.2d 199 (La. 1999). A trial court presented with such a request must decide whether reasonable jurors could find, based on the evidence presented by the

---

[1] The State contends that Petitioner's attack on the sufficiency of the evidence regarding lewd or lascivious acts was not exhausted in the state courts because it was not presented in his writ application to the Supreme Court of Louisiana. Tr. 620-42. The State also argues that Petitioner's argument in the writ application regarding position of control or supervision was based solely on state law. To satisfy the exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A), a claim must be presented in a discretionary writ application. O'Sullivan v. Boerckel, 119 S.Ct. 1728, 1732 (1999). The claim must also be presented under federal law because habeas relief is not available on state law claims. Baldwin v. Reese, 124 S.Ct. 1347, 1349 (2004). It appears that Petitioner did fail to exhaust his state court remedies with respect to the "lewd or lascivious" element. But the state court decisions he cited in support of his sufficiency argument on the control element applied principles from Jackson, so Petitioner arguably exhausted that aspect of the claim. The undersigned has elected to address the claims on the merits as allowed by §2254(b)(2).

accused, that the victim had made prior false accusations.  Id.  The exclusion of such evidence was affirmed in State v. Frith, 747 So.2d 1269, 1273-74 (La. App. 2d 1999) when the appellate court found that reasonable jurors could not have found that the victim made prior false accusations.  The man involved in the prior event had actually pleaded guilty to contributing to the delinquency of the minor.

Judge Ramona Emanuel held an evidentiary hearing on the issue and heard from Mr. Haas, the man MG had allegedly accused of molestation.  Mr. Haas testified that he was 29, married to MG's aunt, and was himself the father of three young children.  He worked as a supervisor for a local oilfield company.  Mr. Haas said that MG used to often visit and play with his children, but he was concerned that she bossed and bullied the younger children.  He banned her from his home after she asked to borrow his phone to call a mentor but actually called a boy.

Mr. Haas did not describe a direct accusation made by MG.  He said that his wife told him that MG got in trouble about a boy one day, and to cover it up she began "hollering people names."  He was told that his name was among them, and he heard that his name was written on MG's wall.  He said he heard that "Dolla name was on there and it's supposed to been specific stuff written by Dolla name, and everybody else name was just on the wall from what I was told."  The police were never called, and Haas was never questioned about the allegation until the day of his testimony.  Tr. 195-204.

Stephanie Mosely, the DA's Victim's Assistance Coordinator, also testified.  Ms. Mosely said that MG told her about a prior occasion where a man she called Yella (Mr. Haas's nickname) who was married to a relative had molested her.  MG said that she told

her family, but they did not believe her, and the police were not informed. Ms. Mosely said MG never recanted the allegations about Yella, and MG continued to say that she wanted him prosecuted for what he did. Tr. 205-10.

Judge Emanuel heard argument and reviewed the relevant decisions cited by the parties. She noted the question was whether reasonable jurors would find based on the evidence presented that the victim had made a prior false accusation. She stated: "Based on what has been adduced, the Court does not find that there has been evidence of prior false allegations of molestation and thusly the Court grants the motion." Tr. 214-15.

### 2. Procedural Bar

The state asserts a procedural bar defense to this claim on the grounds that Petitioner did not include a federal-law claim on this issue in his writ application, and it is now too late to present the claim in state court. Proper exhaustion does require that a claim be presented to the state court within a federal constitutional framework. Scott v. Hubert, 635 F.3d 659, 667 (5th Cir 2011), citing Baldwin v. Reese, 124 S.Ct. 1347 (2004) (claim in state court petition for ineffective assistance of appellate counsel not exhausted because not identified as federal in nature). The determination of whether the claim was presented in such a fashion is made by looking to the briefs filed in state court. Smith v. Digmon, 98 S.Ct. 597 (1978); Soffar v. Dretke, 368 F.3d 441, 467 (5th Cir. 2004). Petitioner raised the issue in his brief to the appellate court, and he argued that the exclusion of the evidence violated his rights under the Confrontation Clause of the Sixth Amendment. Tr. 536-38. But his writ application to the Supreme Court of Louisiana presented the claim solely as a violation of state evidence law, with no invocation of federal law. Tr. 634-36.

Failure to present a federal claim in a writ application means the claim has not been properly exhausted. <u>O'Sullivan</u>, 119 S.Ct. at 1732. It is now too late, given Louisiana's two-year limitations period, for Petitioner to return to state court and properly exhaust this claim. In such cases, the Fifth Circuit instructs that the federal court is to treat the issue as technically exhausted but subject to a procedural bar which cannot be overcome absent the showing of cause and prejudice or a fundamental miscarriage of justice. <u>Jones v. Jones</u>, 163 F.3d 285, 296 (5th Cir. 1998); <u>Sones v. Hargett</u>, 61 F.3d 410 (5th Cir. 1995). The State raised this defense in its brief. Petitioner filed a reply but did not attempt to articulate facts that would meet his burden of showing cause and prejudice with respect to this claim. Accordingly, the claim is subject to the procedural bar defense.

### 3. The Merits

The claim also fails on the merits. The Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense." <u>Kittelson v. Dretke</u>, 426 F.3d 306, 318 (5th Cir. 2005). That right includes the right under the Confrontation Clause to rebut the State's evidence through cross-examination in an effort to show that a witness is biased or unbelievable. <u>Id</u>. at 318-19. But a trial judge has discretion to impose reasonable limits on cross-examination based on concerns about harassment, confusion of the issues, relevance, or other factors. Whether the exclusion is of constitutional dimension depends on the reason for the exclusion and the effect of the exclusion. <u>Id</u>. at 319.

The trial judge applied a narrow exception to a general state evidence rule that would have otherwise excluded the evidence. She found that the evidence was not admissible because a reasonable juror could not have found that there had been a prior false claim of

molestation.  The evidence supports her assessment.  The victim did not recant her claim, nor was it disproved.  It was merely denied by the alleged perpetrator.  When the claim was assessed on direct appeal, the appellate court found that the trial judge's decision was "clearly supportable" by the record.

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).  The Kittelson decision cited above set forth rules based on clearly established Supreme Court decisions.  The trial judge's decision to exclude the evidence is perhaps debatable under those rules, but it was not so obviously wrong as to be an objectively unreasonable application of those principles.  The decision was also based on a quite reasonable assessment of the facts presented at the hearing.  Accordingly, habeas relief is not permitted under the demanding standard of Section 2254(d).[2]

---

[2] In Kittelson, two girls accused the defendant of molesting them.  One of the girls recanted immediately.  The trial court prohibited the defendant from asking the recanting child or investigating officer about the false allegation.  The Fifth Circuit granted habeas relief in that case, but the facts here are distinct.  There was no recanting in this case.  MG was adamant that Haas molested her.

**Ineffective Assistance of Counsel**

### A. Introduction

Petitioner argues that his attorney rendered ineffective assistance in a number of ways. To prevail on such a claim, Petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

Petitioner presented his Strickland claims in his post-conviction application. The trial court denied the claims in two written opinions. Tr. 740, 750. The appellate court summarily denied a writ application "[o]n the showing made." Tr. 831. The Supreme Court of Louisiana denied a writ application in a short opinion that stated Petitioner failed to carry his burden of showing counsel's performance was deficient under Strickland. Tr. 895.

### B. Habeas Review

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be." <u>Harrington v. Richter</u>, 131 S.Ct. 770, 786 (2011). Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. <u>Id</u>. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id</u>.

### C. No Objection to Detective Belle's Testimony

Petitioner argues that counsel was ineffective because he did not object to Detective Deondre Belle's testimony about MG's descriptions of Petitioner's actions. Belle testified that he observed the Gingerbread House interviews, and he also interviewed MG separately. The prosecutor asked Detective Belle about the writings on MG's wall, which included one barely legible one that he read as, "2010 Dolla touched my pusy and he was wrong for that." Another writing said that Dolla "did it again," and another said that the writer was "sick and tired of him" and was going to tell someone. Tr. 372-74.

The prosecutor then asked Detective Belle if MG ever told him what the writings referred to. Belle said that MG said the writings referred to different times that Petitioner "touched her inappropriately and when he penetrated her vagina with his penis." Belle went on to say that MG said there had been three instances. First, Petitioner came in drunk, pulled down MG's clothes, asked her to give him five minutes, and "he tried to put his penis in her vagina, but it wouldn't go in." The second time, Petitioner "grabbed her breasts, grabbed her butt and tried to grab her vagina," but she pushed him away. The third time was when Petitioner came in drunk, smelling of alcohol, and "pulled down her pants

while she laying in bed."  MG tried to tell him to stop, but "he stuck his penis in her vagina" for about four or five minutes.  Tr. 375-76.

Petitioner argues that defense counsel did not properly challenge this testimony on the grounds that there was no supporting evidence of rape/penetration.  He notes Dr. Rodriguez's testimony that there was no evidence of physical harm to MG.  The state trial court denied this claim for failure to make a sufficient showing under the Strickland standard.  Tr. 750-53.  The appellate and supreme courts summarily denied relief.

Belle's testimony on these matters was likely hearsay, but that is not the nature of Petitioner's habeas claim.  He argues that counsel was constitutionally ineffective because he did not challenge Belle's testimony based on the lack of corroborating evidence.  MG stated in her Gingerbread House interview that Petitioner had used his "private part" and forced it inside of her "private part."  There was, therefore, evidence of penetration that came directly from MG's testimony.  Considering her testimony, the other evidence of molestation, and the degree of deference due under Section 2254(d), Petitioner has not demonstrated that he is entitled to relief from his conviction based on this claim.

### D.  No Objection to Gingerbread House Video Interviews

Petitioner argues that counsel was ineffective because he should have objected to the introduction of the Gingerbread House videos on the grounds of "confusion of the issues or misleading the jury."  The State introduced the videos pursuant to La. R.S. 15:440, which allows the admission of recordings of child victims when the requirements of the statute are met.  On direct appeal, the appellate court stated that all statutory requirements were followed, all three victims were available for cross-examination, and "the tapes were

clearly admissible." State v. Davis, 108 So.3d at 843-44. Petitioner has not articulated any basis on which counsel could have objected and successfully excluded the admission of the videos. Accordingly, the state court's rejection of this Strickland claim does not warrant habeas relief.

### E. Uncalled Witnesses

An investigator for defense counsel interviewed two of MG's sisters. They denied that their uncle molested them, and they said they believed MG tried to blame Petitioner after she "got caught" messing with a boy. Petitioner faults counsel for not talking to these witnesses and calling them at trial.

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000). A petitioner "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." Day v. Quarterman, 566 F.3rd 527, 538 (5th Cir. 2009).

Petitioner faults counsel for not speaking with these witnesses, but his investigator did so and gave counsel a memorandum regarding the interviews. The record does not disclose why counsel chose not to call the witnesses, but it could have had to do with their lack of any eyewitness observation or firsthand observation, as well as the rules of evidence that generally preclude testimony about the credibility of another witness. In any event, Petitioner did not demonstrate through affidavits or otherwise that the witnesses were willing and able to testify and deliver admissible evidence that would have helped the

defense.[3]   The state court's denial of this <u>Strickland</u> claim was not objectively unreasonable.

### F.  No Motion to Quash Habitual Offender Bill

Petitioner argues that his counsel was ineffective because he did not object to the habitual offender charge on the grounds that the 10-year cleansing period had expired between the completion of his sentence for his most recent conviction and the date he committed the current offenses.  The statute, La. R.S. 15:529.1(C), provides that the current offense shall not be counted as a second or higher offense if more than 10 years have elapsed "between the date of the commission of the current offense or offenses and the expiration of the maximum sentence or sentences of the previous conviction or conviction …."  The statute adds that "any period of parole" shall not be included in the computation of the 10-year period.

Eileen Cook, a probation and parole officer, testified at the habitual offender hearing.  She said that Petitioner had a conviction for distribution of cocaine and received a 10-year sentence.  Cook did not say so, but the conviction was in 1989.  She testified, "He was on supervision the last time with us from December 25, 1997 until May 26, 2002."  She explained that Petitioner's parole had been "revoked once and then (he) came back out

---

[3]  <u>Cox v. Stephens</u>, 602 Fed. Appx. 141, 146 (5th Cir. 2015) ("Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified ..."); <u>Gray v. Epps</u>, 616 F.3d 436, 443 (5th Cir. 2010) (petitioner failed to show uncalled witnesses were available to testify where affidavits did not contain statement to that effect); and <u>Evans</u>, 285 F.3d at 377 (reversing habeas relief when no affidavits were presented from the alleged witnesses).

on supervision and then he completed it satisfactorily (in 2002) when I had him." Tr. 456-57.

Petitioner argues that counsel should have moved to quash the multiple offender bill because it was "virtually impossible" that he was on parole supervision until 2002 for a 1989 conviction with only a 10-year sentence. The extra three years or so, however, may be explained by Ms. Cook's testimony that parole was revoked once, meaning Petitioner had to return to prison for a time before he was given another chance at completing a period of parole. Petitioner's arguments are based on mere speculation. The state court's application of Strickland to these facts was reasonable.[4]

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus relief be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another

---

[4]Petitioner exhausted this claim in his post-conviction application. The Supreme Court of Louisiana denied a writ application with the observation that claims of ineffective assistance of counsel during habitual offender proceedings are not cognizable on collateral review. Tr. 895. The court cited State v. Cotton, 45 So.3d, 1030 (La. 2010), which federal courts have recognized as an independent and adequate procedural bar that would prevent consideration of the merits of this claim. McKeaver v. Cain, 2013 WL 1402365 (W.D. La. 2013); Warfield v. Warden, 2012 WL 3067604 (W.D. La. 2012). The State has asserted the procedural bar as a defense, but it need not be reached given the claim's lack of merit.

party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 24th day of August, 2018.



Mark L. Hornsby
U.S. Magistrate Judge